IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM and TISSUEGEN, Inc.<br><br>Plaintiffs,<br><br>v.<br><br>BOSTON SCIENTIFIC Corp.<br><br>Defendant. | Civil Action No. 18-392-GBW |

## MEMORANDUM ORDER

Plaintiffs TissueGen, Inc. ("TissueGen") and the Board of Regents, The University of Texas System ("UTBOR") (collectively, "UT") allege that Defendant Boston Scientific Corp.'s ("BSC") "Synergy" brand coronary stents (the "Accused Products") infringe U.S. Patent No. 6,596,296 ("the '296 patent"). D.I. 124 ¶¶ 1–3, 79. Pending before the Court are UT's *Daubert* Motion to Exclude Testimony of David A. Haas (D.I. 191) and BSC's Motion to Exclude Expert Testimony (D.I. 199) (the "Motions"). Both parties argue that the opposing damages expert fails to properly apportion damages between patented and unpatented features of the Accused Products. *See* D.I. 192 at 1; D.I. 200 at 40. The Court denies the Motions because both experts had good grounds for their apportionment analyses.[1]

### I. LEGAL STANDARD

#### A. Motions to Exclude Evidence

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993), the Supreme Court held that Federal Rule of Evidence 702 creates "a gatekeeping role for the [trial]

---

[1] The Court has reviewed the parties' briefing, D.I. 192; D.I. 212; D.I. 219; D.I. 200; D.I. 214; D.I. 220, writes for the benefit of the parties, and assumes familiarity with the case.

judge" in order to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. As the Third Circuit has explained,

> Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit. Qualification refers to the requirement that the witness possess specialized expertise. We have . . . [held] that a broad range of knowledge, skills, and training qualify an expert. Secondly, the testimony must be reliable; it must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his o[r] her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity. Finally, Rule 702 requires that the expert testimony . . . must be relevant for the purposes of the case and must assist the trier of fact.

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404–05 (3d Cir. 2003) (cleaned up); *Kuhar v. Petzl Co.*, 2022 WL 1101580, at *7 (3d Cir. Apr. 13, 2022) (noting the same trilogy).

Rule 702 "'has a liberal policy of admissibility[,]'" *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (citation omitted); *see also United States v. Scripps*, 599 F. App'x 443, 447 (3d Cir. 2015) (same), as "the question of whether the expert is credible or the opinion is correct is generally a question for the fact finder, not the court[,]" *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 83 (3d Cir. 2017) (quoting *Daubert*, 509 U.S. at 596).

2

## B. Apportionment of Patent Damages

"A patentee is only entitled to a reasonable royalty attributable to the infringing features [of an accused product]. The patentee 'must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features.'" *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018) (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)); *see First Quality Tissue, LLC v. Irving Consumer Prod. Ltd.*, 2022 WL 958089, at *12 (D. Del. Mar. 30, 2022) (quoting *Power Integrations*, 904 F.3d at 977). Thus, "to be admissible, all expert damages opinions must separate the value of the allegedly infringing features from the value of all other features." *Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) (citation omitted). "If it can be shown that the patented feature drives the demand for an entire multi-component product, a patentee may be awarded damages as a percentage of revenues or profits attributable to the entire product." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012).

Apportionment must rely upon "'reliable and tangible' evidence." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) (quoting *Garretson*, 111 U.S. at 121). "'[T]he essential requirement' for reliability under *Daubert* 'is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product.'" *Commonwealth Sci.*, 809 F.3d at 1301 (citation omitted). Data utilized in a damages model must be "'sufficiently tied to the facts of the case.'" *Id.* at 1302 (citation omitted).

## II. DISCUSSION

Both parties seek the exclusion of the other side's damages expert's testimony for failure to apportion. UT argues that BSC's damages expert, Mr. David A. Haas ("Haas"), relied on an "entirely arbitrary" apportionment factor of 50 percent that "is devoid of any reliable

3

methodology or economic analysis, and is not sufficiently tied to the facts of this case." D.I. 192 at 1. BSC argues that UT's damages expert, Justin Lewis ("Lewis"), uses three "fatally flawed" apportionment methodologies: one that "claims damages for the entire [Accused Product]" and two that "use a 90% figure plucked out of thin air without any supporting basis." D.I. 200 at 40.

Both parties respond that their damages experts base their apportionment factors on sound, defensible methodologies. BSC argues that "Haas's report . . . includes a thorough, multi-factor analysis to arrive at his ultimate conclusion" supported by consideration of features that BSC contributed to the Accused Products and "comparable real-world market transactions that apportioned incremental profits between similar patented and non-patented technology." D.I. 212 at 1–2. UT argues that Lewis's approaches to determine a reasonable royalty find support in Federal Circuit caselaw. D.I. 214 at 25–27. The Court finds that UT's and BSC's objections to each other's damages report go the weight of the evidence, not to its admissibility. *See generally Fried v. JP Morgan Chase & Co.*, 850 F.3d 590, 599 (3d Cir. 2017) ("The proverb 'what is good for the goose is good for the gander' applies . . . .").

### A. Haas Testimony

Haas explains in the May 2, 2022 Rebuttal Expert Report of David A. Haas (D.I. 193, Ex. A, "Haas Rpt."), that "the presence of the readily available non-infringing PROMUS stent alternative would have significantly limited [BSC]'s willingness to pay a royalty on units that could otherwise avoid practicing the '296 patent." Haas Rpt. ¶ 155. Further, Haas explains that

> [t]he parties would have considered the average incremental profit of [the Accused Product] over PROMUS, which was between $35 and $111. However, . . . they would have known it was necessary to apportion away elements of this value that did not relate to the '296 patent. While Mr. Lewis acknowledges this, he still allocates 90% to 100% of the incremental profit to the '296 patent. My discussions with [BSC] personnel and my consideration of the elements described throughout this report, including, but not limited to, under Factor #13[,] suggest that the majority of incremental benefit was due to [BSC]'s contributions and not the '296 patent. No more than half of the incremental profit is attributable to the '296 patent.

4

> As such, no more than 50% of $47.15, or $23.57, represents the maximum incremental profit attributable to the '296 patent.

Haas Rpt. ¶ 156 (footnotes omitted) (emphasis in original).

Haas built his conclusion on analysis that appeared earlier in his report. Haas explained that, based on his review of BSC's technical expert's report, BSC's prior drug-eluting stent, the "PROMUS PREMIER," which the '296 patent does not cover, had many features that appealed to clinician users. *See* Haas Rpt. ¶¶ 37, 47 & n.62. The Accused Products' advantages over the PROMUS stents, Haas explained, were "thinner struts" with greater strength and flexibility, better "steerability of the stent into position during the insertion procedure," and a drug-eluting coating only on the surface (rather than in the interior) of the stent. Haas Rpt. ¶¶ 54–56. Haas spoke with BSC's Vice President, Clinical and BSC's Senior Research Fellow and learned that BSC had to "consider, test, and formulate solutions to" various "issues"—such as stent design, delivery apparatus, coating process, outer and inner surface treatment processes, and inspection systems—to create the Accused Products. Haas Rpt. ¶ 135. BSC developed stent coating hardware and software, paid for testing, obtained FDA approval, and engaged in marketing and sales of the Accused Products. Haas Rpt. ¶¶ 137–40. Haas, thus, concluded that "the lion's share of incremental profits that [BSC] has derived from sales of [Accused] [P]roducts over PROMUS products should be credited to [BSC]'s own development efforts, testing efforts, regulatory approval efforts, and marketing sales efforts as opposed to the much more limited contributions of the patent-in-suit." Haas Rpt. ¶ 141.

UT argues that "Haas conceived the 50% apportionment factor on his own. Nowhere in his report does Mr. Haas include any quantitative analysis explaining how he reached the 50% apportionment factor." D.I. 192 at 4. UT, thus, argues that Haas's apportionment factor is "arbitrary." D.I. 192 at 3; *see* D.I. 219 at 1 ("Nowhere else [other than paragraph 156] . . . does

5

Mr. Haas describe any methodology to support his calculation of a 50% apportionment factor . . . ."). UT also argues that Haas offers "opinions that require expertise in the field of interventional cardiology." D.I. 219 at 2. BSC responds that "Haas's opinion is a straightforward application of the accepted methodology for apportioning the incremental value of patented technology in a multi-component product. For example, he literally analyzed each of the elements from *Georgia-Pacific* factor #13 to determine what portion of the profit 'should be credited to the invention . . .' . . . ." D.I. 212 at 8 (citation omitted).

An expert may apportion revenue attributable to patented and unpatented features of an accused product "through a proper analysis of the *Georgia-Pacific* factors. . . . '[T]h[at] . . . analysis takes account of the importance of the inventive contribution in determining the royalty rate that would have emerged from the hypothetical negotiation.'" *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*, 879 F.3d 1332, 1349 (Fed. Cir. 2018) (citing *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116 (S.D.N.Y. 1970)) (most citations omitted). The expert must tie the *Georgia-Pacific* factors to the reasonable royalty rate selected through consideration of "'the facts of the case . . . .'" *Id.* (citation omitted). "While mathematical precision is not required, some explanation of both why and generally to what extent the particular factors impact the royalty calculation is needed." *Id.* at 1350 (cleaned up).

Here, Haas's substantial qualitative analysis supported his testimony as to the apportionment factor, a part of the reasonable royalty rate calculation. *See Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*, 2018 WL 5729732, at *2 (D. Del. Nov. 2, 2018) (explaining that, since "'any reasonable royalty analysis necessarily involves an element of approximation and uncertainty[,]'" an expert could rely on "qualitative, instead of quantitative, analyses" (quoting *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009)); *see also* Haas Rpt. ¶

6

57 (reviewing the Accused Products' research and development costs over 10 years). Haas spoke with BSC employees and reviewed the report of BSC's technical expert. Haas used that information to determine what contributions BSC made to the Accused Products over and above those of the '296 patent. Thus, the Court declines to exclude Haas's opinion that "[n]o more than half of the incremental profit [from the Accused Products over the PROMUS stent] is attributable to the '296 patent" or the 50% apportionment factor that Haas drew therefrom. Haas Rpt. ¶ 156. Haas's lack of quantitative analysis does not preclude admissibility. Indeed, "it may be impossible to quantitatively determine the exact percentage of a royalty rate that corresponds to each component of a licensed product." *Bio-Rad Lab'ys*, 2018 WL 5729732, at *2.

UT also contends that Haas was "not qualified to evaluate all of the highly technical testimony he cites . . . ." D.I. 219 at 5. While Haas uses technical language in his comparison of the Accused Products and the PROMUS stents, *see* Haas Rpt. ¶¶ 47, 54, Haas relies on BSC's expert and discussions with BSC personnel to reach his opinions, *see* Haas Rpt. ¶¶ 54–56 nn.71–79, and BSC's expert offers simple explanations of the advantages that some of those technical improvements give to users, *see* D.I. 203-51, Ex. 1 ¶¶ 21–29. More importantly, Haas carefully evaluated the investments BSC made in the successful development and sale of the Accused Products (e.g., submission for FDA approval) in non-technical terms and based on conversations with named BSC personnel. *See* Haas Rpt. ¶¶ 135–40. Haas cites these non-technical descriptions of BSC's investments in the Accused Products' development to support his 50% apportionment factor. *See* Haas Rpt. ¶ 156 (citing Haas's analysis under *Georgia-Pacific* Factor #13, which included Haas Rpt. ¶¶ 135–40). Thus, the Court finds that Haas was qualified to offer the opinions that supported his 50% apportionment factor analysis.

For the reasons above, the Court denies UT's Motion to exclude Haas's testimony.

## B. Lewis Testimony

Lewis uses three methodologies to develop his proposed reasonable royalty: the "Analytical Approach," the "Hypothetical Negotiation" Approach, and the Income Approach. D.I. 203-48 §§ 4.2, 6. In the Analytical Approach, Lewis first subtracted the sales price of the PROMUS stents from that of the Accused Products to get the Accused Products' profit premium. *Id.* § 5.1. Lewis then reviewed BSC documents to find that the "bioabsorbable polymer coating was the key differentiator over PROMUS," but noted that certain other "qualitative evidence" pointed to additional features that differentiated the Accused Products from the PROMUS stents. *Id.* § 5.2. Lewis then relied on analysis from BSC technical expert Dr. Kirk Garratt ("Garratt") to conclude that the bioabsorbable polymer coating—i.e., the innovation of the '296 patent— accounted for 90% of the premium the Accused Products earned over the PROMUS stents. *Id.*; *id.* at fig. 13. In the Income Approach, Lewis evaluated the difference in price and market share between the Accused Products and the PROMUS stents and, again, concluded that the unpatented features of the Accused Products drove no more than 10% of the resulting higher profit. *Id.* § 6.1.2. In the Hypothetical Negotiation Approach, Lewis described license agreements between TissueGen and UTBOR for the '296 patent and between BSC and a third party for technology related to the Accused Products. *Id.* § 6.1.1. He then evaluated whether the licenses were economically and technically similar to a hypothetical license that UT would negotiate with BSC for use of the '296 patent in the Accused Products. *Id.* After adjusting the licenses for technical and economic differences, Lewis calculated a reasonable royalty rate. *Id.*

In his Corrected Expert Report (D.I. 203-49, "G. Rpt."), Garratt compares the features of the Accused Products to those of the PROMUS stents and opines that "the only material difference" between them "is the stent coating component of the stent systems" (i.e., the innovation of the '296 patent). G. Rpt. ¶ 12. Garratt also opines, based on (1) his experience

8

using both types of stents and (2) how BSC marketed those stents to him and to his colleagues, that "feature differences other than those relating to stent coating components were not material to differentiating" the two stents. *Id.* ¶¶ 8, 13. Thus, Garratt opined, other improvements of the Accused Products over the PROMUS stents "would account for no more than 10% of a decision on which [of the two] stent[s] to purchase." *Id.* ¶ 13.

BSC argues that "Lewis's Analytical and Income Approaches depend entirely on [Garratt's] 90% apportionment rate" for their apportionment factor. D.I. 200 at 47. Garratt's opinion, BSC argues, is "unsupported and unreliable" because he lacked a clear methodology, any analysis, or sufficient evidence. *Id.* at 47–49. UT responds that Lewis conducts his own analysis and that Garratt's opinion derives from his "extensive experience as an interventional cardiologist," use of both stent types, and interactions with BSC salespeople. D.I. 214 at 32–33. "[E]stimating a reasonable royalty is not an exact science." *Summit 6*, 802 F.3d at 1296. However, Rule 702 requires that expert testimony be "supported by good grounds." *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 834 (3d Cir. 2020) (internal quotation marks and citation omitted). An expert may offer opinions based on personal experience if the expert also "explain[s] how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Integra Lifesciences Corp. v. HyperBranch Med. Tech., Inc.*, 2018 WL 1785033, at *6 (D. Del. Apr. 4, 2018); *360Heros, Inc. v. GoPro, Inc.*, 569 F. Supp. 3d 198, 204 (D. Del. 2021) (collecting cases) ("[P]ersonal, relevant experience can serve as a foundation for reliability.")

Here, Garratt had "good grounds" for his opinion. Garratt explained why he thought the "only material difference" between the PROMUS stents and the Accused Products was "the stent

9

coating component." G. Rpt. ¶ 12. Garratt also opined that BSC marketed the Accused Products to him and other physicians he knew based on that coating and described his personal experience placing different stent types. G. Rpt. ¶¶ 8, 13, 16. Garratt's opinions supported his conclusion that only the coating—and not other factors—drove stent purchasing decisions. Garratt's 10% estimate is certainly imprecise, but Garratt's expertise permitted him to attribute that much weight to differences between the stents that he found non-material. *See* G. Rpt. ¶ 13. Tellingly, BSC turns to its own technical expert's evaluation of other factors that may have driven sales of the Accused Products to discredit Garratt. *See* D.I. 200 at 50. The Court will leave it to the jury to weigh the opinions of the parties' experts and determine the weight to give their respective testimony. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 290 (3d Cir. 2012) ("The respective credibility of [the parties'] experts was a question for the jury to decide."). The Court need not decide if Lewis's alleged separate apportionment analysis was adequate. *See* D.I. 214 at 31.

BSC also argues that Lewis's Hypothetical Negotiation Approach violated the "entire market value" rule because Lewis "uses as his royalty base the entire market value" of the Accused Products—including, e.g., unaccused metal stents, catheters, and balloons—and relied on license agreements for patents and products not at issue here. D.I. 200 at 44–45; D.I. 220 at 23–25. UT responds that Lewis "accounts for the value added by the patented feature in the royalty rate." D.I. 214 at 29–30. The hypothetical negotiation "attempts to calculate the royalty rate the parties would have agreed upon had they negotiated an agreement prior to the start of the infringement." *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 971 (Fed. Cir. 2022). "'[A] patentee may assess damages based on the entire market value of the accused product only where the patented feature creates the basis for customer demand or substantially creates the value of the

10

component parts.'" *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014) (citation omitted). Otherwise, the patentee must apportion a product's value between patented and unpatented product features. *See Ericsson*, 773 F.3d at 1226. "[T]he ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more." *Id.* (citation omitted). Where unpatented features contribute to a product's value, use of the entire market value of the product as a royalty base risks misleading the jury. *Id.* at 1226–27; *Virnetx*, 767 F.3d at 1328–29. Courts must require "a more realistic starting point" which is, "often, the smallest salable unit and, at times, even less." *Ericsson*, 773 F.3d at 1227. However, "further apportionment may not [] be required" in the "unusual" case where another license agreement is "sufficiently comparable" and, thus, has "'built-in apportionment.'" *Vectura Ltd. v. Glaxosmithkline LLC*, 981 F.3d 1030, 1040 (Fed. Cir. 2020) (citation omitted); *Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*, 927 F.3d 1292, 1301 (Fed. Cir. 2019) (finding expert analysis "incorporate[d] the required apportionment" when the licensed "component" was "comparable" to the patented component of the "larger product"). Experts must still evaluate "meaningful economic" and technical "differences" between the comparator license and the license from the hypothetical negotiation. *Vectura*, 981 F.3d at 1041.

Here, Lewis's analysis of two sets of licenses properly accounted for the value of unpatented features using the royalty rate. Lewis evaluated an exclusive license that UTBOR sold to TissueGen for use of the '296 patent and related patents and a non-exclusive license to sell products that used certain coating technology, which a BSC-related entity purchased from a third party. D.I. 203-48 §§ 6.1.1.1, 6.1.1.2. Since both licenses used net sales of licensed products as the royalty base, *id.*—the same royalty base at issue here, *id.* § 4.1—and since the products covered by both licenses appear to contain more than the patented technology, *id.* §§

11

6.1.1.1 (charging "3% of net sales of products that practice" intellectual property both covered by and "not covered by the agreement"), 6.1.1.2 (license covering "medical devices intended for clinical use, the manufacture of which uses coating technology"), both licenses have built-in apportionment. *But see Acceleration Bay LLC v. Activision Blizzard Inc.*, 2019 WL 4194060, at *5 (D. Del. Sept. 4, 2019) (rejecting "cursor[]y" built-in apportionment argument where the expert failed to discuss the concept in the expert report). Lewis also evaluated how various factors—such as UTBOR's interest in encouraging use of its inventions, the lower rate for non-patented material in BSC's license, and the inclusion of know-how, along with rights to use technology, in both license agreements—could affect whether the hypothetical negotiation would result in a higher or lower royalty rate. *See* D.I. 203-48 §§ 6.1.1.1, 6.1.1.2. Lewis found that comparable rates of 3% and 2.5 to 5% for the UTBOR and BSC licenses, respectively, accounted for those differences.[2] *Id.* The parties agree that the Accused Products are the "smallest saleable unit," D.I. 220 at 23, and UT does not dispute that non-infringing components contribute to the Accused Products' value, *see* D.I. 214 at 27–28. Thus, to avoid confusing the jury, UT may be required to further apportion the royalty base. *See Ericsson*, 773 F.3d at 1227. However, these comparable licenses build in apportionment by applying the royalty to a base of product sales, and Lewis accounts for economic and technical differences between the comparator and

---

[2] Lewis also evaluated an exclusive, third party license agreement that covered stents which use the same drug as the Accused Product. D.I. 203-48 § 6.1.1.3. Lewis admitted that the license was "geared towards the drug" rather than to the "stent coating[,]" *id.*, and suggested that the license was not comparable to this case, D.I. 222-8 at 244:21–245:4. However, BSC's failure to mention the third-party license in its Reply Brief, outside of a footnote, D.I. 220 at 24–25 & n.16, waived its arguments related thereto, *see John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("[A]rguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived."); *Affinity Empowering, Inc. v. Eurofins Sci., Inc.*, 2022 WL 6734604, at *3 (D. Del. Oct. 11, 2022) (same). BSC's motion does not challenge the third-party license's comparability or argue that repeated references to BSC's total revenue from the Accused Products could prejudice the jury. *See Elbit Sys.*, 927 F.3d at 1301–02.

hypothetical negotiation licenses in the royalty rates. *See Vectura*, 981 F.3d at 1041. For example, just as the patented technology was the "key component" of a prior license to more than 400 patents that the *Vectura* Court found comparable, *id.*, the comparator UTBOR license covered only patents related to the '296 patent, D.I. 203-48 § 6.1.1.1. Thus, the Court finds that UT was not required to further apportion its royalty base in its hypothetical negotiation analysis.

Lewis properly apportioned the Income and Analytical Approaches and used comparable licenses with built-in apportionment. Thus, the Court denies BSC's Motion.

### III. Conclusion

For the reasons stated above, the Court finds that Haas's expert testimony is admissible because he used qualitative analysis and appropriately relied on BSC personnel and BSC's expert to apportion the difference between the PROMUS stents and the Accused Products between patented and unpatented features. The Court similarly finds that Lewis's expert testimony is admissible because Garratt's personal experience as a practicing expert provided good grounds for his 90% apportionment factor and because Lewis apportioned the value attributable to the '296 patent using the royalty rate from comparable licenses. Thus, the Court denies the Motions.

WHEREFORE, at Wilmington this 12th day of December, 2022, **IT IS HEREBY ORDERED** that UT's *Daubert* Motion to Exclude Testimony of David A. Haas (D.I. 191) is **DENIED** and that BSC's Motion to Exclude Expert Testimony (D.I. 199) is **DENIED**.

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE